MILDRED L. GOULD & others *vs.* GREYLOCK RESERVATION COMMISSION & another.

Berkshire.    February 10, 1966. — March 10, 1966.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, SPIEGEL, & REARDON, JJ.

*Greylock State Reservation. Parks. Mount Greylock Tramway Authority. Public Authority. Contract,* Validity, With public authority. *Words,* "Ski facilities."

The provisions of St. 1953, c. 606, as amended by St. 1955, c. 476, relating to the Mount Greylock Tramway Authority are to be interpreted strictly and as not permitting activities in the Greylock State Reservation inconsistent with its character as rural park land unless such activities are clearly allowed.    [419]

The provision of St. 1955, c. 476, § 7, for a lease by the Greylock Reservation Commission to the Mount Greylock Tramway Authority of "any portion" of the Greylock State Reservation authorizes a lease of only such portions of the reservation as are reasonably necessary to a proper project of the Authority; and on the facts a lease of nearly one half the reservation, including substantial portions thereof as to which no such necessity was shown, was held to cover an excessive area and to be invalid.    [421–423]

A certain "management agreement" between the Mount Greylock Tramway Authority and a private corporation, whereby, respecting a recreational project of the Authority having aspects suggestive of a commercial enterprise for profit, the Authority delegated virtually all its functions to the corporation, with only general supervisory control of doubtful effectiveness in the Authority, and the corporation was to share in the profits of the project, was not within the scope of the powers given to the Authority by St. 1953, c. 606, as amended by St. 1955, c. 476, and was invalid.    [423–427]

PETITION filed in the Superior Court on July 9, 1964.

The case was heard by *Noonan, J.*

*John L. Saltonstall, Jr. (Joseph D. Steinfield & Walter E. Reilly* with him) for the petitioners.

*John M. Harrington, Jr. (James S. Parkhill, Jr.,* with him) for Mount Greylock Tramway Authority & others.

*Edward W. Brooke,* Attorney General, *& John E. Sullivan,* Assistant Attorney General, for the Greylock Reservation Commission, joined in a brief.

CUTTER, J. Five citizens[1] of Berkshire County seek a writ of mandamus and declaratory relief against the Greylock Reservation Commission (the Commission) and the Mount Greylock Tramway Authority (the Authority). They ask for a declaration that two instruments are invalid, viz. a 1960 lease to the Authority of 4,000 acres in the Greylock State Reservation and a 1964 agreement between the Authority and a management corporation. They also seek to prohibit the Commission and the Authority from proceeding with a scheme for the leased area for an aerial tramway, ski lifts, and a ski resort. A judge of the Superior Court adopted a thorough auditor's report as his findings of material facts[2] and made rulings. He ordered that the petition be dismissed. The petitioners appealed.

Mount Greylock (3,491 feet) is the highest summit of an isolated range surrounded by "lands of considerably lower elevation." Prior to 1888, this range was subject to commercial lumbering operations. About 1888, a group of citizens "became associated . . . for the purpose of preserving Mount Greylock as an unspoiled natural forest." By St. 1885, c. 166, a corporation (Greylock Park Association) was formed "for the purpose of laying out a public park upon Greylock Mountain." It did acquire about 400 acres including the mountain summit.

"Through the efforts of persons interested in preserving Mount Greylock in its natural state for the . . . [public]

---

[1] The first petitioner named in the petition, William J. Cartwright, died after the case was entered in this court.

[2] The judge made one finding of fact not made by the auditor, viz. that there were thirteen privately owned and operated ski areas within about forty miles of the proposed Greylock ski area.

benefit," the Greylock State Reservation was established by St. 1898, c. 543. Section 1 provided for an unpaid commission appointed by the Governor. The Commission (§ 2) was authorized to acquire 10,000 acres to be known as the Greylock State Reservation, and was given (§ 4) certain powers of the Metropolitan Park Commission (St. 1893, c. 407). A grant of $25,000 from the Commonwealth's treasury (§ 3) was not to be available (§ 7) until the property held by Greylock Park Association "shall have been transferred to the Commonwealth." This was done in 1899. The Commonwealth has since acquired about 8,400 additional acres. The auditor found that there was "no evidence of . . . any restrictions or conditions in any of the deeds" to the Commonwealth of land in the reservation.

Access to the summit is now provided by two roads, the Rockwell Road from New Ashford and the Notch Road from North Adams. West of the summit these two roads join a short road to the summit itself. A simplified outline map (based on exhibits) is annexed [3] upon which these roads are shown,[4] together with certain principal features of the proposed tramway and ski area.

---

[3] Existing roads are indicated by double lines. The leased area, mentioned below, is bounded on the west by the Rockwell Road and the Notch Road. Except where the leased area's boundary follows these roads or town lines, it is shown by a broken line (— .. —). Proposed access roads are shown by solid lines. Areas to be cleared for the proposed tramway and chairlifts are shaded. Lines indicate the tramway and chairlifts. Ski paths, existing and proposed, also are indicated by shaded areas. The part of the reservation not included in the lease (a little larger than the leased area) lies north and west of Rockwell Road and Notch Road. The portion of the Appalachian Trail (from Maine to Georgia) within the reservation is shown because it follows roughly the height of land of the Greylock Range from Mount Williams (north of Mount Fitch) over Mount Fitch, Mount Greylock, and the several summits on Saddle Ball Mountain.

[4] The reservation now contains a camping ground, a few small camps near foot trails, and three ski trails, but no ski-lifts. Near the summit of Mount Greylock there are picnic tables, a parking area, a garage and work shop, certain television and radio facilities, and a memorial tower (St. 1930, c. 411), in addition to Bascom Lodge which has a restaurant and overnight accommodations for about ten persons. The Greylock range has a varied forest. In 1,450 acres which lie above the 2,800 foot contour may be found interesting trees, plants, birds, and animals generally found in Canada. The area contains unusual geological formations. It is frequently visited by students, ornithologists, scientists, and naturalists, as well as by tourists, motorists, and persons walking on the trails.

Gould *v.* Greylock Reservation Commission.

THE ENABLING ACTS.

The Authority was established as "a body politic and corporate . . . [to] be deemed a public instrumentality"

by St. 1953, c. 606, § 3.   See amendments by St. 1955, c. 476, St. 1959, c. 608.   See also St. 1960, c. 100.   The Authority was empowered by c. 606, § 1, to construct and operate a toll tramway and to issue revenue bonds to pay the costs.[5] It was to consist of the chairman of the Commission and four members appointed by the Governor with the approval of the Council.   Section 6 of the 1953 act (as amended by § 2 of the 1955 act) gave to the Authority specific power to "acquire, construct . . . and operate an aerial tramway and all appurtenances thereto on the Adams side of Mount Greylock" and certain other facilities.[6]   It was provided by § 10 of the 1953 act (as amended by St. 1955, c. 476, § 5) that the Authority should so fix rates and tolls (free from regulation by any department or agency of the Commonwealth) as to provide a fund sufficient to operate the project, to pay the principal and interest on the revenue bonds, and to create certain reserves "as the [A]uthority in its discretion may provide."   Section 16 (as amended by § 6 of the 1955 act) directed that the project be transferred to the Commonwealth when there has been payment, or provision for payment, of the revenue bonds.

---

[5] Tramway revenue bonds were not to be a debt of the Commonwealth. Various provisions for a guarantee of interest by the Commonwealth (St. 1959, c. 608, § 4, changing § 10 of the 1953 act; see also the 1955 act, § 5), were held invalid in *Singleton* v. *Treasurer & Recr. Gen.* 340 Mass. 646, 651–652. See also St. 1959, c. 608, § 2.

[6] These were described in § 6 as "such other facilities, works and improvements as approach roads to the . . . base of the tramway; parking facilities at said . . . base; *ski facilities*, stores, including gift, souvenir and ski or equipment shops; dining and refreshment facilities; lounges, comfort stations, warming huts and other such accommodations for the convenience . . . of the public; and such other facilities and services as are *reasonably necessary* for the public purposes of the authority" (emphasis supplied).   See fn. 15, *infra*. Section 6 also gave the Authority power to acquire and lease property and to purchase or take by eminent domain "such public or private lands, public parks" or reservations, except those controlled by the Commission, "as it may deem necessary for carrying out" the act; to make "contracts . . . necessary or incidental to . . . its duties" and to employ such "consulting engineers, construction and accounting experts, and attorneys, and such other employees and agents, as may be necessary in its judgment" and to pay them "solely from the proceeds of revenue bonds . . . or from . . . revenues"; to "operate places for . . . refreshments . . . [and] accommodations for visitors and for the sale or rental of . . . merchandise in any way connected with the facilities . . . or for the convenience" of visitors, "and to lease or grant the right to exercise such powers"; and to do "all . . . things necessary or convenient to carry out the powers expressly granted."

## THE 1960 LEASE.

Section 7 of the 1955 act authorized the Commission "to lease to the . . . Authority, with the approval of the governor and council, any portion of the Mount Greylock reservation . . . including . . . facilities . . . thereon, for . . . not exceeding forty years . . . and the . . . commission, with the approval of the governor, is . . . empowered to . . . [restrict] the use of any such property not leased . . . to prevent competition with the property leased." On December 31, 1960, the Commission purported to lease to the Authority 4,000 acres of the Greylock reservation lying east of Notch Road and Rockwell Road.[7] The leased land constitutes a little less than half the total reservation (8,800 acres). The lease is to begin when the Authority sells its initial revenue bonds and to end at the expiration of forty years from that date or upon the prior payment of certain revenue bonds. The Commission, by the lease, purported to relieve itself of the obligations to maintain the war memorial, access roads, and public ways on the leased land. It also agreed to refrain from permitting or establishing facilities on the reservation which would compete with the Authority's project.[8]

## THE PRESENT PROJECT AND THE 1964 MANAGEMENT AGREEMENT.

From 1953 to 1964, the Authority made no progress toward borrowing the necessary money. An initial appropriation of $10,000 (St. 1953, c. 606, § 17) was spent for

---

[7] The sketch plan (see fn. 3, *supra*) shows that the leased area includes a considerable part of the slopes of Saddle Ball Mountain, Mount Greylock, and Mount Fitch, but no part of Mount Williams, which lies to the north of the boundary between Adams and North Adams.

[8] The Authority, as lessee, agreed (a) that it would maintain at its expense the public ways and parking areas for the use of the Commission in connection with maintaining the war memorial, (b) that it would set aside an area within a radius of three quarters of a mile from the war memorial as a memorial park (see St. 1959, c. 608, § 1), and (c) that it would not assign or sublet the leased premises except as permitted by the enabling legislation. The instrument as recorded contains an indorsement, "Approved in Council January 3, 1961," signed by the executive secretary. The records of the Executive Council show that, with the then Governor presiding, the lease was approved on that day by the Council.

engineering, with the consequence that the Authority now has no funds. In February, 1964, a new chairman was appointed who retained, to assist in the Authority's further efforts, consulting engineers, financial consultants, legal and bond counsel, auditors, and architectural consultants. In March, 1964, Allen & Company, a New York investment house, advised the Authority that, upon certain conditions,[9] it was willing to underwrite $5,500,000 of five per cent, callable, twenty-five year revenue bonds, to pay construction costs of $3,235,000.[10] Allen & Company, in association with Willamette Construction Company (Willamette), organized a joint venture corporation, American Resort Services, Inc. (Resort) with a capitalization of $300,000. Willamette presented general studies (subject to later revision) for constructing a very extensive ski development on the east slope of Mount Greylock, with a large activity center at the base of the mountain, including an access road, a swimming pool, restaurant, fireplace, barbecue pit, bar, sun deck, summer dance terrace, ski shop, gift shop, ski rental and repair room, and parking space for 2,000 automobiles. These facilities would be placed on between 425 and 935 acres of land east of, and outside of, the reservation (toward Adams), which the Authority would have to acquire. In addition to the tramway there would be four separate double chair lifts and eleven ski trails (including the existing trails), an upper terminal house, and an expanded Bascom Lodge. The portion of these facilities within the reservation would surround about 470 acres of which 115 acres would be directly developed and 111 acres would have to be cleared of trees and vegetation for the tramway, for chair lifts (strips sixty to eighty feet wide), and ski trails (strips sixty to one hundred feet wide).

---

[9] The conditions included (1) a guaranteed fixed price contract for tramway construction, (2) assurance of competent management, (3) a trust agreement to protect bondholders, and (4) an agreement that Allen & Company could purchase the bonds.

[10] The $2,265,000 above the construction costs would be used for construction contingencies, capitalizing bond interest for twenty-six months, underwriter's fee, bond issue expense, road improvements, land acquisition, the Authority's preliminary and first year expenses, working capital, promotion expense, and a general contingency fund.

On October 6, 1964, the Authority entered into what is entitled a "management agreement" with Resort, employing Resort "as its agent" to manage the tramway and related facilities "under the general control and supervision and at the expense of the Authority . . . in conformity with applicable statutory provisions, policies, regulations and procedures prescribed . . . and plans, programs and budgets approved by the Authority." There is a comprehensive delegation to Resort[11] of duties in respect of fiscal operations, budgets, records, accounting, annual reports, purchases, inventory controls, insurance, contracting, and various other matters.

Resort is to provide three executives who "in the name of the Authority and under its general control and supervision" shall give on "a full-time basis general executive supervision and managerial services." Their salaries and other benefits are to be established and paid in the first instance by Resort, subject to reimbursement by the Authority as stated below. Other employees are to be retained by Resort at the Authority's expense. The agreement is to be subject to a so called "safeguard agreement" between the Commission and the Authority,[12] to the lease, and to any trust agreement issued for the protection of bondholders. No such agreement is yet in existence. Revenues are to be the property of the Authority. Additional facilities acquired by the Authority are to become subject to the agreement.

---

[11] Section 210 requires the Authority to adopt rules and regulations "relating to the day-to-day performance of . . . [the] agreement." All other directions given by the Authority to Resort are to be given in writing, authorized by a resolution of the Authority. Resort's recommendations to the Authority are to be acted on "without undue delay, and, if rejected, the Authority" must furnish Resort a statement of reasons. This provision must be read with § 304 which gives Resort power to terminate the agreement if the Authority, contrary to Resort's recommendation, "shall take any action which materially . . . affects the [tramway] net revenues . . . such as reducing tolls or increasing operating costs."

[12] This supplemental agreement of October 6, 1964, recognized that the leased area above an altitude of 2,800 feet is "unique . . . in the light of the flora and fauna present." Subject to its statutory obligation to construct a tramway, the safeguard agreement requires the Authority (a) to take protective steps to avoid damage to the "environment . . . above . . . [that] altitude" and to effect "conservation of the natural resources of the whole area," and (b) to ensure that its contractors do likewise.

The Authority is annually to reimburse Resort for the salaries and fringe benefits of the three executives, up to an aggregate of $75,000 (plus certain specified cost of living increases), but only from the balance (for convenience referred to hereafter as "net operating revenues") of gross revenues in each fiscal year remaining after payment of, or provision for, (i) all costs of operation (exclusive of Resort's compensation), (ii) sinking fund requirements and requirements for principal and interest on the revenue bonds, and (iii) reserve funds. Resort each year (subject to detailed provisions in the agreement) is to receive forty per cent of the tramway "net operating revenues" (after the further deduction of the reimbursement payable to Resort in respect of the three executives).[13]

Resort is to have at the time of the original issue of revenue bonds, cash on hand of at least $300,000 (unencumbered except for the $200,000 guarantee provision mentioned below) and is to provide a $200,000 guarantee fund, to be available (a) to indemnify the Authority for any breach by Resort, and (b) to make up any deficiency in funds available to the Authority for the payment of revenue bond interest. This fund will remain to some extent available even after a termination of the agreement for default. The agreement, apart from termination for default, is essentially for the life of the bonds, or a period ending thirty years from the initial issue of bonds, if then only refunding bonds are outstanding.

The Authority's financial consultants consider that the plan presented by Allen & Company is feasible, but "that if it were not for the . . . [m]anagement [a]greement and the equity feature . . . therein, including the right under certain circumstances of Resort . . . to receive compensation equal to forty percent . . . of the excess remaining in any year after [expense] payments . . . the sale of the

---

[13] Certain further compensation of Resort is provided, viz. (a) for reimbursement of expenses and services prior to opening the tramway, $75,000, and (b) upon payment of all the bonds earlier than thirty years from the date of the first issue, a further sum computed as provided in § 301. These provisions for compensation are in addition to any compensation (fn. 10) which Allen & Company may receive for underwriting services and Willamette may receive for construction work.

bonds would not be feasible." This "financing arrangement is an unusual one and would not justify the risk of investing unless the bondholder has some assurance of the success of the project."

There "is no binding commitment . . . of Allen & Company to underwrite the bonds and there is in existence no guaranteed contract for the construction of the tramway and other facilities at a fixed sum." The Authority has received a fixed fee proposal for the engineering and construction of the project from Willamette, "an experienced builder of tramways," at a proposed cost of $3,235,000.

The auditor also found that, since "the use of the . . . tramway is . . . optional by the public and because there is no history of such a facility on this mountain and because there are competitive facilities, and because this facility [farther south than the large ski resorts in Vermont and New Hampshire] will have a shorter ski season than competitive facilities, the degree of skill and efficiency with which the facility is managed and advertised is of great importance as related to the success of the project and consequent safety of the bonds."

1. The Greylock reservation, as rural park land, is not to "be diverted to another inconsistent public use without plain and explicit legislation to that end. . . . The policy of the Commonwealth has been to add to the common law inviolability of parks express prohibition against encroachment . . . ." *Higginson* v. *Treasurer & Sch. House Commrs. of Boston,* 212 Mass. 583, 591–592. See *Jacobson* v. *Parks & Recreation Commn. of Boston,* 345 Mass. 641, 644. See also *Salem* v. *Attorney Gen.* 344 Mass. 626, 630–631. Cf. *Trustees of Reservations* v. *Stockbridge,* 348 Mass. 511, 514 (where legislative authorization for taking open land was sufficiently specific). We thus are to interpret the relevant statutory provisions strictly and as permitting within this forest reservation no activities inconsistent with the apparent purpose of St. 1898, c. 543, except as the Legislature, in the exercise of those powers which it possesses (see *Lowell* v. *Boston,* 322 Mass. 709, 730), may clearly have given permission for them.

Statute 1953, c. 606, § 6 (as amended by St. 1955, c. 476, § 2, see fn. 6, *supra*), gave the Authority power (as quoted above) to construct and operate "an aerial tramway and all appurtenances thereto" together with certain related facilities. These facilities (and [a] the bottom half of the tramway and of two chairlifts and [b] one complete chairlift, see the sketch map) will be on land outside the present reservation, near the lower tramway terminus, to be acquired by the Authority. Within the reservation, however, the project contemplates the construction of (a) the upper parts of the tramway and of two chairlifts, (b) one complete chairlift (running south from near the summit of Mount Greylock), (c) ski trails covering ninety-three acres (all of which will be cleared of trees) and (d) other facilities covering twenty-two acres (eighteen of which will be cleared).[14]

As we read the statute, the basic feature of the authorized project is the tramway. Nothing is said about chairlifts unless they come within the term "appurtenances" or the term "ski facilities"[15] in the enumerated special conveniences mentioned in the latter part of § 6 (a) as

---

[14] These 115 acres of land appear to be the only portion of the approximately 4,000 acres subject to the 1960 lease, apart from the existing roads, as to which actual development by the Authority is contemplated.

[15] The legislative history of St. 1955, c. 476, does not very clearly explain the term "ski facilities." In 1955 Senate Bill No. 495, as filed, it was proposed that § 6 (a) of the 1953 act be amended to permit construction of an "aerial tramway . . . and all appurtenances, facilities, works and improvements *necessary or desirable in connection therewith, including, but not being limited to,* access roads, parking facilities, restaurants, comfort stations, gift shops, *ski trails and ski tows and elevators*" (emphasis supplied). The Committee on State Administration revised the bill (reported as 1955 Senate Bill No. 669) to substantially the form eventually enacted (see fn. 6, *supra*). The words italicized above were omitted, including the words "ski trails and ski tows and elevators." By amendment in the Senate one of the proponents of 1955 Senate Bill No. 495 obtained insertion of the words "ski facilities" after the words "parking facilities at said bottom terminus or base." See 1955 Senate Journal, p. 1004. This legislative history is at best ambiguous. In context, we think that "ski facilities" was less extensive than the language originally proposed. In the light of the earlier committee change, the ambiguous amendment provides meager basis for proposing such major developments as the four chairlifts and the extensive trail system. Another amendment adopted indicates that the Senate was, in general, restricting the powers of the Authority. The incidental facilities permitted were amended (see 1955 Senate Journal, p. 964) to limit them (see fn. 6, *supra*) to those "reasonably necessary for the public purposes of the authority" rather than to those "the Authority may deem necessary," as in the committee bill.

amended. A reasonable number of ski trails, practice slopes, and the like, we assume, might come within the term "appurtenances" of a tramway to be used for skiers, but four chairlifts of a total length of 14,825 feet and eleven ski trails of a total length of 56,600 feet do not seem reasonably to be within the concepts of mere "appurtenances" of a tramway 6,165 feet long, or incidental "ski facilities." The degree of interference with the natural state and appearance (even from a distance) of the reservation becomes apparent from the map, particularly when it is appreciated that the creation of each cleared space not only removes trees and vegetation from its immediate limits but (as the auditor found) has "a definite effect upon the ecology for some distance back from the edge of the clearing."

The Authority possesses a considerable range of discretion with respect to the scope of the project and many of its powers are broadly expressed. Nevertheless, there is a substantial question whether the somewhat grandiose project now proposed (particularly when its commercial aspects mentioned below are considered) in any event unreasonably exceeds in size the maximum project permissible under the enabling acts. If a project of this magnitude in a State forest reservation had been intended, it would have been natural and appropriate for the enabling legislation to have stated that purpose much more definitely and described its scope more specifically than has in fact been done. We need not determine, however, whether the permissible maximum has been exceeded in view of our decision upon other phases of this matter.

We note that the situation is somewhat analogous to that considered in *Appleton* v. *Massachusetts Parking Authy.* 340 Mass. 303, 310. There we held that generally comparable legislation did not give the parking authority "a roving eminent domain" power within a public park (Boston Common) but confined the authority to the taking of fairly specific and designated areas, together with approaches which "must be reasonable."

2. The petitioners contend that the 1960 lease deals with a far larger part of the 8,800 acre reservation than the

statutes permit.   The statute (St. 1955, c. 476, § 7) author-
izing the Commission to make the lease extends to "any
portion of the Mount Greylock reservation."   In context,
however, this power must be interpreted as intended to
be reasonably related to what the statutes permit the Au-
thority to do as a project.   See *Opinion of the Justices*,
330 Mass. 713, 725; *Appleton* v. *Massachusetts Parking
Authy*. 340 Mass. 303, 310.   If this is not the proper inter-
pretation, then the Legislature has delegated to the Com-
mission (without clearly defining the scope of what is in-
tended, essentially without restrictions, and subject to no
sufficiently stated standards) power to deal in its unfet-
tered discretion with a large, unique tract of public park
land.   See *Druzik* v. *Board of Health of Haverhill*,
324 Mass. 129, 134; *Opinion of the Justices*, 334 Mass. 721,
732–733, 743; *Opinion of the Justices*, 341 Mass. 738, 759.
Cf. *Mosey Cafe, Inc.* v. *Licensing Bd. for Boston*, 338 Mass.
199, 205; *Opinion of the Justices*, 341 Mass. 760, 775–776;
*Massachusetts Bay Transp. Authy.* v. *Boston Safe Deposit
& Trust Co.* 348 Mass. 538, 544–550.

We conclude that § 7 of the 1955 act authorized the Com-
mission to lease only those portions of the reservation
which may prove to be reasonably necessary to a project
of permitted scope.   No necessity has been shown for leas-
ing more than (a) so much of the "Adams side of Mount
Greylock" (see § 6 of the 1953 act as amended by St. 1955,
c. 476, § 2) as thus may be reasonably required, and (b)
perhaps also some areas closely surrounding roads.   No
occasion at all has been established for leasing, as has been
done by the 1960 lease, any reservation land (except roads)
in New Ashford or Williamstown or the slopes of Saddle
Ball Mountain or of Mount Fitch.   The necessity for leas-
ing any land not actually to be used was greatly reduced,
of course, by the provision of St. 1955, c. 476, § 7, already
quoted, which authorized the Commission to restrict land
not leased against use in competition with the Authority.[16]

---

[16] Further confusion is added by St. 1959, c. 608, § 1, which directs the
Commission to set aside the portion of the reservation within a three-quarters
mile radius of the memorial tower as a memorial park.   The 1960 lease was

We hold that the 1960 lease covered an excessive area and thus was not authorized by the statutes.

3. The 1964 management agreement constitutes substantially a complete delegation of the duties of the Authority to Resort. This joint venture corporation is owned by the proposed, but as yet uncommitted, underwriter of the revenue bonds and the proposed, but at most partially committed, engineer and constructor of the tramway project.

Examination of the agreement, briefly summarized above, shows that the Authority will have at most only general supervisory control over Resort's actions. To be sure, the agreement frequently states that Resort's performance is to be under the Authority's "general control and supervision." A close reading, however, raises strong doubts whether the Authority, on a limited budget for its own (as opposed to Resort's) expenditure,[17] will be in a position to exert any practical or effective supervision over Resort. Resort will hire at least all the Authority's operating employees and have power to remove them. Indeed, the agreement does not make plain that the Authority can compel the removal of even the three principal executives to be furnished by Resort or that they need be satisfactory to the Authority.[18]

The delegation of the Authority's duties seems to us broader than the type of arrangement contemplated by the power to make contracts found in St. 1953, c. 606, § 6 (g)

made despite this provision, although the Authority, in the lease (fn. 8, *supra*), covenanted to "set aside that portion" of the leased premises as such a park. It is not clear whether the Legislature intended to permit any tramway facilities within this memorial park.

[17] The agreement provides that the Authority's initial annual budget (after the tramway is in operation) for expenses "outside the purview of . . . [the] agreement, including general administration and salaries . . . [and] fees . . . of the Authority's attorneys, consulting engineers . . . financial advisers and other consultants and employees shall not exceed $40,000. Comparable arrangements are contemplated for later years. This provision may have been included for the protection of bondholders to keep down the Authority's expenses, but it also may greatly restrict the Authority's ability to regulate Resort's activities.

[18] An example of the extent of the delegation of substantially every function given to the Authority by the enabling statutes is to be found in the provision that Resort is to prepare an annual report to the Authority, which "shall be in form, to the fullest extent feasible, suitable for submission by the Authority" as its statutory annual report.

and § 10, as amended, respectively, by §§ 2 and 5 of the 1955 act. Doubtless, the power to make contracts includes those necessary for construction, for various aspects of the operation of the tramway, and for the grant of concessions. We find in the enabling legislation, however, no suggestion that the Authority was authorized to divest itself of essentially all its statutory functions, reserving at most only general supervisory powers.

The Authority's contracting power thus given does not appear to be in any relevant respect materially different or broader than that given to various other public authorities mentioned in the margin.[19] We would be slow to hold that the similar very general language of comparable statutory provisions was intended to empower these authorities to turn over all their respective operations to a manager who would be compensated by a percentage share of the net operating revenues.

The unusual character of the arrangement made by the management agreement is accentuated by the provision, already discussed, by which Resort is to receive as its compensation (after payment of all the tramway operating expenses) forty per cent of the "net operating revenues" (after deducting the expense of the three executives). Resort thus has a direct equity interest in the project until the bonds are paid. If the project is successful, despite com-

---

[19] The power to make contracts given to the Authority by St. 1953, c. 606, §§ 6 (g) and 10, as amended, respectively, by St. 1955, c. 476, §§ 2 and 5, is similar to that granted to certain other public authorities in Massachusetts. See e.g. St. 1946, c. 562, §§ 5 (g), 9 (Mystic River Bridge Authority); St. 1952, c. 354, §§ 5 (m), (n), 10 (as amended by St. 1958, c. 384, § 4; see St. 1958, c. 598, § 11) (Massachusetts Turnpike Authority); St. 1956, c. 465, §§ 3 (1), (o), 14 (Massachusetts Port Authority). See also St. 1960, c. 701, § 4 (f) (Woods Hole, Martha's Vineyard and Nantucket Steamship Authority). Section 10 of the 1953 act, as amended in 1955, mentioned above, deals largely with the fixing and adjustment of rates. It reads in part, "The authority is . . . authorized to fix, revise . . . and collect rates, rents . . . and tolls for the use of the tramway and for use or occupancy of the project, or any part thereof, or any service or facility provided by the project, or any part thereof, and to contract with any person . . . or corporation desiring any such use or occupancy, and to fix the terms, conditions, rates, rents . . . and tolls for such use. Such rates, rents . . . and tolls shall be so . . . adjusted from time to time in respect of the aggregate of such rates, rents . . . and tolls from the project as to provide a fund sufficient" to pay or provide for various specified costs. We perceive in this provision no justification for the extensive delegation of powers which has been made.

petition (fn. 2), a short snow season, and any other ob-
stacles, Resort, without necessary capital investment or
risk, beyond $300,000, including the guarantee fund (which
may never be used), will become entitled to a considerable
share of any profits. Of course, the Authority, by reducing
tolls, can and should restrict Resort from receiving exces-
sive compensation in this manner, but fears of inadequate
revenues in later years (and fear that Resort may attempt
to terminate the agreement because of its objections to toll
reductions) may tend to deter toll adjustments after good
years.

The provision doubtless will be an incentive to Resort
for good performance, while subject to the control of its
present sponsors, and may result in economical operation
for the protection of the bondholders.[20] Nothing, however,
assures that the shareholders of Resort will not sell their
shares, or that other shareholders will operate Resort in-
telligently and in economical fashion, or in a manner con-
sistent with the primary purposes of the reservation. It
may be difficult, of course, for the Authority to exercise its
somewhat ambiguous power to terminate the agreement for
poor performance, or to persist in reducing tolls in the
face of objections by Resort, for the Authority has no oper-
ating organization of its own.

It is our duty, of course, in considering the powers
granted to an unusual public authority of this character to
look at the substance of what it is authorized to do, or pro-
poses to do, to determine whether it is designed or used to
accomplish proper public objectives or is, instead, being
employed as an artifice to obscure some other type of activ-
ity. See e.g. *Ayer* v. *Commissioner of Admn.* 340 Mass.
586, 593–598. We recognize that in recent years much
wholly proper use has been made of authorities to carry
out important public projects. Nevertheless, these entities

---

[20] It is apparently one purpose of the management agreement (see fn. 9,
*supra*) to ensure bondholders efficient tramway management. Without knowl-
edge of the contents of any trust agreement to be made hereafter in connec-
tion with the revenue bonds, there is no occasion to consider to what extent
the powers granted by the management agreement are intended, or may
properly be given, for security. See Restatement 2d: Agency, §§ 138–139.

present serious risk of abuse, because they are frequently relieved of statutory restrictions and regulation appropriately applicable to other public bodies.[21] We note one troublesome aspect of the project now before us.

This recreational scheme, in the profits of which Resort is to share, is to compete (fn. 2) with private recreational ventures of similar character. The profit sharing feature and some aspects of the project itself strongly suggest a commercial enterprise. In addition to the absence of any clear or express statutory authorization of as broad a delegation of responsibility by the Authority as is given by the management agreement, we find no express grant to the Authority of power to permit use of public lands and of the Authority's borrowed funds for what seems, in part at least, a commercial venture for private profit. If the enabling acts have not authorized such an arrangement, the contention that an equity participation by the underwriter and construction company is necessary in order to obtain revenue bond financing cannot provide a justification for the agreement. The Authority, of course, can seek further legislative authorization within proper constitutional limits.

The situation is not comparable to that considered in *Massachusetts Bay Transp. Authy.* v. *Boston Safe Deposit & Trust Co.* 348 Mass. 538, 548, where, in a situation of great public importance and emergency, the Legislature had expressly "decided that contracting with private companies" engaged in regulated public utility operations, very directly affected with a public interest, was "an appropriate means for" meeting the public need for transportation. There we dealt with contracts in the nature of subsidies to privately owned utilities pursuant to adequate legislative authorization. See *Opinion of the Justices,* 337 Mass. 800, 806–807.

---

[21] See e.g. discussions in the 1953 report of the Council of State Governments, Public Authorities in the States, and in Gerwig, Public Authorities in the United States, 26 Law & Contemp. Prob. 591, 612–618 (and other related articles in the autumn, 1961, number of that journal); Morris, Evading Debt Limitations with Public Building Authorities, 68 Yale L. J. 234; note, 43 B. U. L. Rev. 122.

We need not consider whether the commercial aspects of the venture are sufficiently serious to deprive the project of any public purpose or to make improper, in whole or in part, the tax exemption granted by St. 1953, c. 606, § 8. See *Opinion of the Justices,* 341 Mass. 738, 754–758; *Opinion of the Justices,* 341 Mass. 760, 778–780. Cf. *Cabot* v. *Assessors of Boston,* 335 Mass. 53, 60–65. We also need not now determine whether or to what extent the various aspects of the management agreement could have been expressly authorized by statute. We hold merely that the operating agreement is not within the scope of the enabling acts as they now stand.

4. In view of what has been said, it is not necessary to consider other contentions advanced by the petitioners.

5. The order for judgment is reversed. A writ of mandamus is to issue to the Commission and to the Authority commanding them to cancel the 1960 lease and the 1964 management agreement. A declaration is to be made stating that these instruments in their present form are not now authorized by the enabling acts.

*So ordered.*