*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 21-CV-84 and 21-CV-183

KALORAMA CITIZENS ASSOCIATION, *et al*., APPELLANTS,

V.

SUNTRUST BANK COMPANY, *et al*., APPELLEES.

Appeals from the Superior Court
of the District of Columbia
(2017-CA-004182-B)

(Hon. Hiram E. Puig-Lugo, Trial Judge)

(Argued March 17, 2022      Decided December 22, 2022)

*Paul H. Zukerberg* for appellants.

*Mary C. Zinsner*, with whom *Elizabeth M. Briones* was on brief, for appellees.

Before EASTERLY and MCLEESE *Associate Judges*, and CROWELL, *Associate Judge, Superior Court of the District of Columbia*.[*]

CROWELL, *Associate Judge*: Appellants Kalorama Citizens Association ("KCA") and Adams Morgan for Reasonable Development ("AMRD") appeal from the Superior Court's grant of summary judgment to appellee SunTrust Bank ("the

---

[*] Sitting by designation pursuant to D.C. Code § 11-707(a).

Bank").[1]  The appellants had sought to enforce an alleged common law easement by public dedication that gave the public the right to use a plaza ("the Plaza") on land owned by the Bank, which sold the Plaza and its adjacent bank building to developers, who intend to tear both structures down in order to build a mixed-use development.

In this case we are asked to determine whether two community organizations have standing to enforce an alleged common law easement by public dedication.  We conclude that they have both constitutional and prudential standing.  Because we remand for consideration of whether the alleged easement exists, we reiterate the requirements for what must be proven to establish a common law easement by public dedication in the District of Columbia.  Further, we hold that such an easement may be express or implied and that it may be accepted either by the government or by the public through general use.

Accordingly, for the reasons stated herein, we hereby reverse the order of summary judgment and remand for further proceedings consistent with this opinion.

---

[1] Since 1976, Perpetual Savings & Loan Association, Crestar Bank, and now SunTrust Bank successively acquired the property at issue in this case and are collectively referred to as the Bank.

## I.      Factual and Procedural Background

The following provides a summary of the evidence proffered by the parties for the purposes of the summary judgment ruling. The record below contains numerous unresolved factual disputes regarding the parties' relative understanding of the agreement or lack thereof that paved the way for the Plaza's construction. As a starting point, in 1976, the Bank sought to build a bank branch in Adams Morgan. At some point that year, community organizations filed objections with the Federal Home Loan Bank Board ("FHLBB") regarding the Bank's application. The planned and now present location at 1800 Columbia Road NW included an undeveloped area that was routinely used as a neighborhood farmers' market and community space. Throughout 1976 and 1977, the Bank, mainly through its president, Thomas Owen, engaged in a series of meetings that the appellants allege were negotiations with the Adams Morgan Organization ("AMO"), the Adams Morgan Advisory Neighborhood Commission ("Adams Morgan ANC"), and other community groups prior to the construction of the bank building. During these negotiations, the Bank sought to obtain the Adams Morgan community's support for the construction of the building, while the community groups sought to maintain the open space for the broader community's use and ensure that the Bank operated according to certain non-discriminatory mortgage lending practices.

On November 2, 1976, Owen, in his capacity as the Bank's president, wrote an open letter to residents of Adams Morgan ("the Owen Letter"), in which he stated that "[the Bank] agreed to develop the property in such a way as to preserve its open quality, attractiveness and accessibility to the vendors that presently use it." Then, on December 6, 1976, Frank Smith, who served as Chairman of the Adams Morgan ANC and AMO at the time that the Bank acquired the property, sent a letter to Owen stating that the community organizations were willing to withdraw their opposition to the bank building's construction. The parties, however, dispute the import, meaning, and binding nature of Owen's and Smith's understandings of the alleged agreement, if any, to construct the Plaza in return for the community organizations' support of the bank building's construction.

By January 17, 1977, the FHLBB had in its possession investigatory materials that included the Bank's architectural plans for the Plaza. In July 1977, the Bank finalized an agreement on mortgage lending practices with the community, which was entitled the Loan Policy Agreement ("LPA"). The LPA detailed the terms for how the Bank would extend mortgages in the community to ensure "the lower and moderate income and minority residents" in the neighborhood would have access to home financing opportunities. The LPA was then submitted to the FHLBB as an amendment to the Bank's licensing application. Notably, the LPA did not mention

the future construction of the Plaza. Smith in his deposition, however, stated that he believed the LPA formally memorialized the parties' agreed-upon terms and that he understood that this agreement included the Plaza's construction and the community's continued use of the space once the Plaza was completed. Essentially, the appellants contend that the community groups withdrew their opposition before the FHLBB at least in part in exchange for the Bank constructing the Plaza. Regardless of the parties' disputed understanding of the Bank's agreement with the community groups, by August of 1977, the community groups withdrew their objections filed with the FHLBB, which cleared the path for approval of the Bank's application to open the new bank building. The Bank subsequently constructed the building and the Plaza, which, in 1979, was opened to the public.

The Plaza exists today, largely as it did in 1979, but ownership of the bank building and the Plaza has changed several times since its opening. At a preliminary injunction hearing, a Bank employee testified that throughout these changes of ownership, the Bank entered into licensing agreements with farmers' market vendors and community groups to use the Plaza. Other uses by the general public have commonly occurred on the Plaza without licenses, such as break dancing, jump rope, and social meetups. The Bank paid for insurance that covered the entire Plaza and contracted for the Plaza's maintenance, including repairs and waste removal. The

Bank paid taxes on the Plaza, physically maintained the Plaza, and settled a slip and fall case from an incident on the Plaza.

In 2015, the Bank contracted to sell the building and the Plaza to 1800 Columbia Road, LLC, a real estate development group ("the Developers"). The Developers intend to raze the bank building and the Plaza in order to construct retail space and condominiums with a substantially reduced public area (from 4,000 square feet down to 380 square feet).

As a result of the Developers' plans to demolish the Plaza, the appellants sought to communicate with the Developers, signed petitions, and drafted various resolutions opposing the Plaza's destruction. The appellants presented their objections to the proposed site changes to the District of Columbia Historic Preservation Review Board, which, on January 26, 2017, deemed the proposed changes, including the removal of the Plaza, compatible with the Washington Heights Historic District. On May 3, 2017, the Developers proceeded with their construction plans and applied for a raze permit to demolish both the bank building and the Plaza.

On June 15, 2017, KCA and AMRD filed suit against the Bank and the Developers in the Superior Court of the District of Columbia. The complaint set forth a claim for declaratory and injunctive relief for the appellants in order to enforce "an easement by dedication in favor of the public for the Plaza." On June 16, 2017, the appellants sought a preliminary injunction to prevent demolition of the bank building and the Plaza during the ongoing litigation. On August 4, 2017, the Superior Court (Edelman, J.) granted the motion for preliminary injunction. A jury trial was then set to commence on April 17, 2018.

In the intervening months, the case was reassigned. The Superior Court (Puig-Lugo, J.) then granted summary judgment in favor of all of the defendants except the Bank. Consequently, on March 7, 2018, the Bank removed the case to federal court due to the parties' diversity of citizenship satisfying subject matter jurisdiction. (In the meantime, the appellants appealed the Superior Court's grant of summary judgement to this court, but we dismissed the appeal as taken from a nonfinal order.) The U.S. District Court for the District of Columbia then remanded the case back to the Superior Court, finding that KCA and AMRD lacked prudential standing to access federal courts under Article III of the U.S. Constitution. The Superior Court then directed the parties to appear and show cause why the preliminary injunction should not be vacated.

At the show cause hearing on January 12, 2021, the Superior Court (Puig-Lugo, J.) vacated the preliminary injunction and then turned to the issues of jurisdiction and summary judgment. The Superior Court assumed constitutional standing and declined to address prudential standing. In granting summary judgment in favor of the Bank, the Superior Court concluded that an essential element of the alleged easement was government acceptance and that the community organizations had failed to demonstrate that there was a triable issue of fact as to that question.

On March 1, 2021, the Superior Court also ordered that KCA's $5,000 bond be released to the Bank and further required that both KCA and AMRD pay $7,167.03 to the Bank for costs. KCA and AMRD are now before this court on a consolidated appeal of the final orders issued by the Superior Court that granted summary judgment in favor of the Bank, released KCA's $5,000 bond, and required KCA and AMRD to reimburse the bank for $7,167.03 in costs.

## II. Standard of Review

The Superior Court's grant of summary judgment is reviewed de novo. *Zere v. District of Columbia*, 209 A.3d 94, 98 (D.C. 2019). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kibunja v. Alturas, L.L.C.*, 856 A.2d 1120, 1127 (D.C. 2004) (quoting Super. Ct. Civ. R. 56(c)). "In determining whether summary judgment was appropriate, we view the evidence in the light most favorable to the non-prevailing party and we draw all reasonable inferences in that party's favor." *Liu v. U.S. Bank Nat'l Ass'n*, 179 A.3d 871, 876 (D.C. 2018).

"If a moving defendant has made an initial showing that the record presents no genuine issue of material fact, then the burden shifts to the plaintiff to show such an issue exists." *Smith v. Swick & Shapiro, P.C.*, 75 A.3d 898, 901 (D.C. 2013) (quoting *Bradshaw v. District of Columbia*, 43 A.3d 318, 323 (D.C. 2012)). "A genuine issue of material fact exists if the record contains 'some significant probative evidence . . . so that a reasonable fact-finder could return a verdict for the non-moving party.'" *1836 S St. Tenants Ass'n, Inc. v. Est. of Battle*, 965 A.2d 832, 836 (D.C. 2009) (quoting *Warren v. Medlantic Health Grp., Inc.*, 936 A.2d 733, 737 (D.C. 2007)).

### III. Standing

As a preliminary matter, we must resolve the question of the appellants' standing. *Moeller v. District of Columbia*, 253 A.3d 165, 170 (D.C. 2021). As noted above, the Superior Court assumed constitutional standing and declined to address prudential standing, but standing is a "threshold jurisdictional question" which every court must address "prior to and independent of the merits of a party's claims." *Grayson v. AT & T Corp.*, 15 A.3d 219, 229 (D.C. 2011) (internal quotation marks omitted). "[As] an elementary matter of jurisprudence . . . an individual must have standing in order to maintain an action." *Burleson v. United Title & Escrow Co.*, 484 A.2d 535, 537 (D.C. 1983) (per curiam). Indeed, "[w]hen the plaintiff lacks standing, the court lacks jurisdiction." *Animal Legal Def. Fund v. Hormel Foods Corp.*, 258 A.3d 174, 191 (D.C. 2021) (citing *UMC Dev., LLC v. District of Columbia*, 120 A.3d 37, 43 (D.C. 2015), for the proposition that a lack of standing is a "defect in subject matter jurisdiction"). Accordingly, we address the jurisdictional and standing issues raised below before reaching the merits of the issues on appeal.

## A. Constitutional Standing

Congress created the District of Columbia court system under Article I of the Constitution, rather than Article III. *Grayson*, 15 A.3d at 224, 233. Article I courts, such as the courts of the District of Columbia, are not bound by Article III standing requirements, but we have consistently followed the constitutional standing requirements embraced by Article III. *Id.* (discussing *Palmore v. United States*, 411 U.S. 389, 397 (1973)).

In order to satisfy the requirements for constitutional standing, a plaintiff must allege facts demonstrating: (1) an injury in fact, meaning an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision. *Id.* at 234 n.36 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-561 (1992)). An association may demonstrate constitutional standing if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose, and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *D.C. Library Renaissance Project/W. End Library Advisory Grp. v. D.C. Zoning Comm'n*, 73

A.3d 107, 113 (D.C. 2013) (quoting *Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201, 1207 (D.C. 2002)). "Constitutional standing must be shown through 'specific facts' set forth 'by affidavit or other evidence' to survive a motion for summary judgment." *Grayson*, 15 A.3d at 246 (quoting *Lujan*, 504 U.S. at 561). Applying this associational standard to the instant record, we conclude KCA and AMRD have constitutional standing.

First, KCA and AMRD members would have standing to sue in their own right. In their affidavits submitted to the Superior Court, KCA and AMRD members affirmed that they regularly attend the farmers' market and other neighborhood events held on the Plaza, and they use the space as a "public square" and community center. *See generally* J.A. 2087 (Belcher, KCA Member Aff.); J.A. 2089 (Hargrove, KCA Member Aff.); J.A. 2091 (Morgan, KCA Member Aff.); J.A. 2093 (Tyborowski, AMRD Member Aff.); J.A. 2095 (Rigby, KCA Member Aff.). Addressing the specific injury that would emanate from the loss of the Plaza by KCA community members, Denis James, President of KCA, wrote:

> [t]he loss of the Plaza would have negative impacts on KCA members' health and adversely affect the livability and vibrancy of the neighborhood KCA strives to preserve and protect. Members of vulnerable groups residing within KCA's jurisdiction, such as senior citizens, persons with low income, and neighborhood children[] would lose access to programs now operated on the Plaza as part of

the farmers' market that provide them with fresh farm products at low or no cost.

J.A. 2081-82 (James, KCA Member Aff.).

The submitted affidavits and statements from individual KCA and AMRD members sufficiently articulate an injury in fact. Plainly, these statements allege a concrete and particularized injury, as the Plaza's demolition would significantly interfere with these individuals' use of the Plaza and lessen the alleged aesthetic and recreational values of the surrounding area. Further, KCA and AMRD members' injuries would be indisputably actual and imminent, because the demolition was only stopped by the initial Superior Court's preliminary injunction. The injury is remediable by an injunction that would prevent the development—and inevitable destruction—of the Plaza, preserving the space for the use and enjoyment by KCA and AMRD members. Given this record, an individual member of KCA or AMRD would be able to seek redress for this concrete injury through a permanent injunction to prevent the development of the Plaza. Accordingly, KCA and AMRD satisfy the first prong of constitutional standing.

Second, the interests that both KCA and AMRD seek to protect are germane to their purposes. KCA's mission "includes promoting the interests of residents who live in the geographic area . . . which consists primarily of the historic Adams

Morgan neighborhood." J.A. 2080. According to James, "KCA members include members of these vulnerable groups who would be negatively affected by not having a farmers' market and public square in their neighborhood. . . . KCA works on all the matters detailed above to prevent negative impacts on the community, including our members and their families." J.A. 2081-82 (James Aff.). AMRD's mission is "to protect and preserve the personal and property interests of DC residents, families, and those living, working, and playing in the historic and unique Adams Morgan neighborhood." J.A. 2084. Its purpose is "to preserve and protect the personal and property interests of participating members and to mitigate against displacement pressures, negative environmental impacts, and adverse [e]ffects on public services, public land and assets." *Id.* The record below demonstrates that preserving the Plaza directly relates to both KCA and AMRD's organizational purposes of promoting the interests of Adams Morgan residents, particularly preserving their property interests, thus satisfying the second requirement of constitutional standing.

Third, neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit. Accordingly, we find that KCA and AMRD satisfy the requirements for constitutional standing.

## B. Prudential Standing

As a prudential matter, a plaintiff generally may not litigate another person's legal right. Super. Ct. Civ. R. 17(a); *Solid Rock Church, Disciples of Christ v. Friendship Pub. Charter Sch., Inc.*, 925 A.2d 554, 559 (D.C. 2007); *District of Columbia v. ExxonMobil Oil Corp.*, 172 A.3d 412, 419 (D.C. 2017) (quoting *Grayson*, 15 A.3d at 235) (stating that prudential standing rules include "'the general prohibition on a litigant's raising another person's legal rights'"). Plaintiffs must show they are within the "zone of interest," which delineates a "prudential" but not a "constitutionally compelled" interest. *See Solid Rock Church*, 925 A.2d at 559 (citing *Brentwood Liquors, Inc. v. D.C. Alcoholic Beverage Control Bd.*, 661 A.2d 652, 654-55 (D.C. 1995)).

An association "can establish [prudential] standing without asserting injury to itself, if it meets the requirements of associational standing." *D.C. Library Renaissance Project*, 73 A.3d at 115 (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975), and *Speyer v. Barry*, 588 A.2d 1147, 1160 & n.25 (D.C. 1991), for the proposition that an organization may satisfy prudential standing requirements when at least one member satisfies the standing requirements). As organizations with associational standing, asserting a legal right allegedly held by the public and thus

by the members of KCA and AMRD, the appellants possess prudential standing to litigate their purported claims to the Plaza on behalf of the public provided the public itself has the right to enforce the easement at all. Accordingly, in order to resolve whether the appellants have prudential standing, this case requires us to resolve whether in the District of Columbia individual members of the public may seek to enforce easements by public dedication.

Numerous courts have found that members of the public can have standing to enforce other forms of public easements. *See, e.g.*, *Gould v. Greylock Rsrv. Comm'n.*, 215 N.E.2d 114, 116-26 (Mass. 1966) (permitting five citizens to bring a suit to limit leasing a mountain summit and surrounding forest); *Paepcke v. Pub. Bldg. Comm'n*, 263 N.E.2d 11, 18-19 (Ill. 1970) (citing *Robbins v. Dep't of Pub. Works*, 244 N.E.2d 577 (Mass. 1969)) (holding the public has standing to enforce the public trust doctrine); *Matthews v. Bay Head Improvement Ass'n.*, 471 A.2d 355, 358 (N.J. 1984) (permitting a public association to bring a right of access suit).

This view is supported by the case law and statutes in this jurisdiction. For example, the then-Court of Appeals of the District of Columbia weighed in on the topic of federal lands held in public trust, explaining "[w]hen land is dedicated for a public park by the municipality, it inures to the benefit of all its citizens. It is held

in trust for the benefit of all its citizens." *Quinn v. Dougherty*, 30 F.2d 749, 751 (D.C. Cir. 1929) (citation omitted); *see also M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) (holding that the District of Columbia Circuit decisions issued prior to February 1, 1971, and the establishment of the District of Columbia Court of Appeals, are binding precedent).  The court later explained that it was a fundamental rule "that one who can look from the front of his house with an unobstructed view upon a park" may bring suit, even if he is not the "abutting owner." *Id.* (discussing *Douglass v. City Council*, 24 So. 745 (Ala. 1898)).  The court further suggested that for federal park lands held in the public trust, a member of the public—to whom the dedication benefits—may enforce the dedication. *Id.*

While analytically distinct from the common law analysis above, the legislature has recognized as a matter of public policy the value of the public holding enforcement rights.  For example, the District of Columbia's Uniform Conservation Easement Act ("UCEA") permits third parties to enforce conservation easements.[2]

---

[2] D.C. Code § 42-201 provides that:

"Conservation easement" means a nonpossessory interest of a holder in real property imposing limitations or affirmative obligations the purposes of which include retaining or protecting natural, scenic, or open-space values of real property, ensuring its availability for agricultural, forestal, recreational, or open-space use, protecting natural resources, maintaining or enhancing air or water quality, or preserving the historical, architectural, archaeological, or cultural aspects of real property.

D.C. Code §§ 42-202.01, 42-203. The third-party right of enforcement is defined as "a right provided in a conservation easement to enforce any of its terms granted to a governmental body, charitable corporation, charitable association, or charitable trust, which, although eligible to be a holder, is not a holder." D.C. Code § 42-201(3).

Accordingly, consistent with other jurisdictions and our case law and statutes, we hold that in the District of Columbia members of the public who enjoy the benefit of an easement, including local neighborhood associations, may enforce an easement. Here, the neighborhood associations are comprised of District of Columbia residents who directly benefit from the alleged easement and would be harmed if their ability to use and enjoy the Plaza were curtailed by its demolition and the subsequent construction of the condominium building. Thus, the community organizations in this case may seek to enforce the alleged easement and have prudential standing to do so.

## IV. Easements by Public Dedication

Having determined that the appellants have standing, we now turn to what the appellants must prove to establish an easement by public dedication. At bottom, an

easement is "an interest in land owned by another person, consisting in the right to use or control the land for a specific limited purpose." *Bd. of Trs., Grand Lodge of Indep. Ord. of Odd Fellows of D.C. v. Carmine's DC, LLC*, 225 A.3d 737, 743 (D.C. 2020); *Martin v. Bicknell*, 99 A.3d 705, 708 (D.C. 2014) (citing *Easement*, *Black's Law Dictionary* 622 (10th ed. 2014)).  An easement by public dedication is "an easement [], by the owner [of the property], for the use of the public, and accepted for such use by or on behalf of the public." *Brown v. Consol. Rail Corp.*, 717 A.2d 309, 315 n.7 (D.C. 1998) (quoting *Black's Law Dictionary* 412 (6th ed. 1990)).  The owner only retains rights that "are compatible with . . . public use[]." *Id.*

To prove an easement by public dedication, a claimant must demonstrate two elements: that the owner offered the dedication, and that the dedication was accepted. *District of Columbia v. Robinson*, 14 App. D.C. 512, 546 (D.C. Cir. 1899) ("The owner must unequivocally dedicate his land to the use of the public and the public must accept.").  To determine that there has been an offer, the owner must have "intended to give or dedicate the land," not merely that the owner "assented to its use by the public." *Id.* at 544.  Similarly, for acceptance to be valid, the finder of fact must determine "that the public actually enjoyed its use for that purpose." *Id.* In effect, acceptance requires performance to be effective.  *See id.*

To our analysis of the existence of an alleged easement by dedication, we apply our recognition in other contexts that, "[t]here are no particular words of art necessary to create an easement by express grant." *Bd. of Trs.*, 225 A.3d at 743 (quoting *Katkish v. Pearce*, 490 A.2d 626, 628 (D.C. 1985)). As with any dispute regarding a written contract, traditional rules of contractual interpretation apply, and the court will look first to the plain language of the purportedly interest-creating document; if it is clear, that ends the inquiry. *Id*. at 743 (citing *Katkish*, 490 A.2d at 628); *see also Found. for Pres. of Hist. Georgetown v. Arnold*, 651 A.2d 794, 796 (D.C. 1994). If the text is unclear, then the court must examine the "surrounding circumstances" of the document's execution. *Id*.; *see also Arnold*, 651 A.2d at 796 ("[T]he parties' intention is to be ascertained by examining the document in light of the circumstances surrounding its execution and, as a final resort, by applying rules of construction"); *see also* Restatement (Third) of Property: Servitudes § 2.2 cmt. a (Am. Law. Inst. 2000) ("To avoid unfairness . . . courts generally seek to ascertain and give effect to the intentions of the parties, even though imperfectly expressed"). Either element of offer or acceptance may be sufficiently demonstrated by the conduct of the parties and the circumstances surrounding the agreement. *See Lansburgh v. District of Columbia*, 8 App. D.C. 10, 19 (D.C. Cir. 1896) ("[A]cceptance may, in all cases, be implied from conduct and be as effectual as one expressly made.").

With those requirements in mind, we turn to the critical question squarely presented by this case, namely, whether easements by public dedication may only be accepted by the government or whether they may also be accepted by the public at large. We endorse the latter view.

The weight of authority supports this view. *See, e.g.*, *Mayor of Macon v. Franklin*, 12 Ga. 239, 244 (1852); *Harris v. Commonwealth*, 61 Va. 833, 837-40, 20 Gratt. 833 (1871); *Allied Am. Inv. Co. v. Pettit*, 65 Ariz. 283, 287 (1947); *City of Tyler*, 246 S.W.2d 601 at 602 (Tex. 1952); *Smith v. State*, 282 S.E.2d 76, 82 (Ga. 1981); *State ex rel. Matthews v. Nashville*, 679 S.W.2d 946, 949 (Tenn. 1984); *TMS Ventures LLC v. Zachariah*, 2021 Ariz. App. Unpub. LEXIS 196 at *7 (Ct. App. Feb. 18, 2021). In establishing its interest, the public acceptance of a dedication of land for public use must be clear and unequivocal. *See, e.g.*, *Star Island Assocs. v. St. Petersburg Beach*, 433 So. 2d 998, 1003 (Fla. Dist. Ct. App. 1983); *Hancock v. Tipton*, 732 So. 2d 369, 372 (Fla. Dist. Ct. App. 1999).

This court's predecessor, the D.C. Circuit, *see M.A.P.*, 285 A.2d at 312, addressed who may accept easements by public dedication and how such easements are created in *Lansburgh*, 8 App. D.C. at 10-19, and *Robinson*, 14 App. D.C. at 512-48. Contrary to the federal district court's ruling effectively adopted by the Superior

Court, they do not stand for the proposition that *only* District authorities may accept an easement by public dedication. Rather, they provide support for the conclusion we reach.

In *Lansburgh*, the titular appellant sought to recover possession of a strip of land that he had donated to the District of Columbia government for the creation of a road. 8 App. D.C. at 16. The case confirms that the District of Columbia government may hold an easement by public dedication, but it does not stand for the proposition that the *only* entity that may hold such an easement is the government. *See id.* at 18. As we explained in *Lansburgh*:

> it may well be doubted whether, as against the right of the owner to retract a dedication once formally made to public use, it is necessary that there shall have been a formal acceptance by the public authorities, in any case. Probably the question would turn upon the peculiar circumstances of each particular case, and not be controlled by a single general rule.

*Id.* at 18-19. The Circuit noted that the Commissioners of the District of Columbia never responded to a letter from the appellant indicating that he would allow a road to be located on his property but observed that "acceptance may, in all cases be implied from conduct and be as effectual as one expressly made." *Id.* at 19. Among the "conduct" the court then highlighted was the "actual occupation" of the road, which presumably was not by the Commissioners personally, but by the general

public.  *Id.*  Furthermore, the case illustrates that a letter may be a valid method of conveying a public easement, explaining the letter was "in itself, a sufficient dedication to the use applied for, and when accepted and acted on by the Commissioners, [the letter] worked a complete estoppel."  *Id.* at 18 (citing *Morgan v. R.R. Co.*, 96 U.S. 716, 723 (1877)).

In *Robinson*, the court reviewed jury instructions given in a trial about District of Columbia officials' use of a road.  14 App. D.C. at 512.  The Circuit discerned "no reversible error in the instructions as given," explaining that "[d]edication may be presumed from the long continued public use," and specifically with regard to acceptance, indicating that either acceptance "on the part of the public authorities" or "the public" would suffice.  *Id.* at 545-46.  Consistent with those cases and several state appellate courts, we now hold that in the District of Columbia an easement by public dedication may be accepted through lengthy continued public use, even without acceptance by the government.

Having now announced the law of easements by public dedication in the District of Columbia, we address the record below in light of this new jurisprudence.

## V.     Applying our Holding to the Facts

### A. Offer

The appellants argue that Owen offered the Plaza as a public dedication in exchange for the community's withdrawal of their FHLBB complaint.  Appellants' Br. 35-36.  In support of their claim, appellants point to a letter written by Owen, drafted on November 2, 1976, which stated in relevant part that the Plaza would be constructed "in such a way as to preserve its open quality, attractiveness and accessibility to the vendors that presently use it."  J.A. 58.  Further, the architect of the Plaza, Seymour Auerbach, in a deposition, testified that he designed the building to allow the vendors to continue their present use of the space.  J.A. 1318.  Marie Nahikian, the Executive Director of the AMO, in her deposition testified that the agreement between the community groups and the Bank stipulated that there "would always be that kind of public access" for use of the Plaza.  J.A. 1375.  Reflecting that understanding, Smith explicitly stated in a signed declaration that in exchange for the withdrawal, the Bank agreed "to dedicate the [P]laza for public use."  J.A. 517.

The appellees counter that the history of licensing the use of the Plaza to various community groups over its many years and the Bank's continued exercise of control over the space illustrate there never was an offer to dedicate. Appellees' Br. 32-33. Further, the LPA negotiated between the Bank and the community groups did not mention the Plaza. J.A. 931. Additionally, an FHLBB memorandum prepared in response to the Bank's FHLBB application, processed on August 1, 1977, solely identified the community opposition to the Bank's application as motivated by its history of discriminatory lending practices. J.A. 906. Akin to the LPA, it made no mention of the Plaza. J.A. 905-06. As the owner's intent in making the offer represents the critical initial inquiry in determining the existence of the easement, *Blank v. Park Lane Ctr.*, 121 A.2d 846, 848 (Md. 1956), we conclude that a genuine dispute of material fact exists as to whether the Bank intended to offer the public an easement by public dedication to the Plaza and, if so, whether it continues.

### B. Acceptance

The appellants argue that the public accepted the proposed dedication through the work that community members of the public conducted with Owen on behalf of the Bank to negotiate the Plaza's creation and develop its design, and through continued use of the Plaza for over forty years. Appellants' Br. 31-32, 34; *see also*

J.A. 1559-60. The appellees counter that the Bank's practice of licensing the Plaza to vendors, and the Bank's continued maintenance of the space is inconsistent with acceptance. Appellees' Br. 33-37. The evidence before the Superior Court regarding use by the public in a manner that indicates acceptance of an easement by public dedication is at least sufficiently in dispute to survive summary judgment.

## VI.    Conclusion

The record reveals a number of factual disputes between the parties that were not specifically addressed or otherwise resolved by the Superior Court in its grant of summary judgment or elsewhere in the record below. The parties' factual disputes are substantial and material to the resolution of the legal questions raised by the appellants' complaint. With this opinion, we announce the legal standard for analyzing alleged easements by public dedication in the District of Columbia. Given that new standard, and the dense and witness-specific evidence below, the record before us necessitates remand. The court acknowledges that the appellees raised several alternative grounds in support of summary judgment that were not addressed by the Superior Court. J.A. 2330-31. Further, we note that we are not addressing the appellants' arguments regarding the bond costs imposed by the Superior Court. The award of such costs are necessarily vacated as premature in light of our decision

to reverse and remand the case. J.A. 2460. Consistent with our general practice, we do not decide those issues in the first instance, instead leaving them to be decided on remand. *See, e.g.*, *Bartel v. Bank of Am. Corp.*, 128 A.3d 1043, 1048 (D.C. 2015).

Accordingly, for the foregoing reasons, the Superior Court's January 12, 2021, order granting summary judgment and dismissing the case is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*