671 P.2d 1085

**KOOTENAI ENVIRONMENTAL ALLIANCE, INC., Appellant,**

v.

**PANHANDLE YACHT CLUB, INC., State Board of Land Commissioners and Department of Lands, Respondents,**

**PANHANDLE YACHT CLUB, INC., Cross-Appellant,**

v.

**STATE BOARD OF LAND COMMISSIONERS and Dept. of Lands, Cross-Respondents.**

No. 13390.

Supreme Court of Idaho.

Nov. 2, 1983.

---

Scott W. Reed and Sue Solomon Flammia, Coeur d'Alene, for appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Sol. Gen., Don A. Olowinski, and L. Mark Riddoch, Deputys Attys. Gen., Boise, Samuel Eismann, Coeur d'Alene, for respondents.

## ON REHEARING

### (The previously filed opinion is hereby withdrawn)

HUNTLEY, Justice.

By this appeal we are asked to determine whether the "public trust doctrine" precludes a grant by the Idaho Department of Lands of a lease to a private club for the construction, maintenance and use of private docking facilities on a bay in a navigable lake.

This appeal further raises the issue of whether the Idaho Lake Protection Act is violative of the public trust doctrine.

In April, 1978, an application for a permit to make an encroachment on Lake Coeur d'Alene was filed with the Department of Lands by Ewing Micken on behalf of Panhandle Yacht Club. The application was for an encroachment 470 feet in length waterward from the ordinary high water mark and 417 feet in width to a depth of 68 feet for the purpose of constructing 112 sailboat slips with pilings, waterways and related facilities for the use of the yacht club members. The permit was for issuance of a ten-year lease, with right to apply for successive ten-year terms.

The leasehold area was to encompass a five-acre area of surface water enclosed by a floating-log breakwater. The 112 slips would cover about one-half of the area within the breakwater. Lake Coeur d'Alene is approximately seventy square miles in size and thus the encroachment impedes navigation on about .01% (.0001) of the lake area.

Notice of the application was published in the Coeur d'Alene press and the Kootenai Environmental Alliance (hereinafter K.E.A.) requested a hearing which was held on June 21, 1978. On August 18, 1978, before a decision was reached by the hearing officer, the State Board of Land Commissioners imposed a moratorium on the issuance of further permits for encroachments on the beds or waters of Lake Coeur d'Alene. On August 21, 1978, the hearing officer granted the permit, entered findings of fact and conclusions of law and decision, which were adopted by the director of the Department of Lands. K.E.A. filed notice of appeal to the district court. An appellate review of the record was conducted before Judge Swanstrom resulting in a decision sustaining the decision of the Department of Lands. K.E.A. appeals.

I

An understanding of the origin and history of the public trust doctrine is essential to reach a proper decision of this appeal. That origin and history is well-encapsulated in the following three paragraphs from the University of Santa Clara Law Review:[1]

"One of the dominant principles of the English common law, at the time of the American revolution, was that navigable waters were under the exclusive control of the King. After the revolution, the King's control of navigable waters in the American colonies was assumed by the original thirteen states. The states, in turn, passed the right to regulate commerce among the states to the new federal government. This federal power includes an expansive right to protect the navigability of navigable waters, so that these waters can serve as highways of commerce. Otherwise, the original thirteen states retained control of their navigable waters. This retained power includes control, not only of the waters themselves, but also of the fisheries and of the underlying beds. When new states joined the Union, they were admitted on an 'equal footing' with the original thirteen states. The western states, including California, thus acquired the same

1. Walston, The Public Trust Doctrine in the Water Rights Context: The Wrong Environ- mental Remedy, 22 U.Santa Clara L.Rev. 62 (1982).

control of their navigable waters and dependent resources as the original states.

This brief historical glimpse describes the powers of the states over navigable waters in our federal system and how that power relates to other states and the federal government. It does not, however, describe the power of the states in relation to their citizens. It describes how the states got their power, but not how they exercise it. The latter subject is governed by the public trust doctrine, an ancient common law doctrine providing for sovereign control of navigable waters.

Under the public trust doctrine, the state, acting on behalf of the people, has the right to regulate, control and utilize navigable waters for the protection of certain public uses, particularly navigation, commerce and fisheries. The state, it is often said, retains a dominant 'easement' or 'servitude' in navigable waters for this purpose. More recent cases have held that the trust includes a broader range of public uses than were recognized in earlier cases; it is now held that the trust protects varied public recreational uses in navigable waters, such as the right to fish, hunt and swim. The trust is a dynamic, rather than static, concept and seems destined to expand with the development and recognition of new public uses." (Footnotes omitted.)

■ The State of Idaho holds title to the beds of all navigable bodies of water below the natural high water mark for the use and benefit of the public.[2] The power to direct, control and dispose of the public lands is vested in the State Board of Land Commissioners pursuant to I.C. § 58–101.

■ *Illinois Central R.R. Co. v. Illinois,* 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018

(1892), is the seminal case on the scope of the public trust doctrine and remains the primary authority today. That decision established the principle that a state, as administrator of the trust in navigable waters on behalf of the public, does not have the power to abdicate its role as trustee in favor of private parties. *Illinois Central* involved the grant to the railroad by the legislature in fee simple of 1000 acres of submerged lands, representing virtually the entire waterfront of Chicago. Four years later the legislature sought to revoke the grant which revocation was challenged by the railroad. The court held that the grant was revocable because one legislature does not have the power to give away nor sell the discretion of its successors. In discussing the grant, 146 U.S. at 452, 13 S.Ct. at 118, 36 L.Ed. at 1042, the court stated:

"That the state holds the title to the lands under the navigable waters of Lake Michigan, within its limits, in the same manner that the state holds title to soils under tide water, by the common law, we have already shown; and that title necessarily carries with it control over the waters above them, whenever the lands are subjected to use. But it is a title different in character from that which the state holds in lands intended for sale. It is different from the title which the United States hold in the public lands which are open to pre-emption and sale. It is a title held in trust for the people of the state, that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein, freed from the obstruction or interference of private parties. The interest of the people in the navigation of the waters and in commerce over them may be improved in many instances by the erection of wharves, docks, and piers

---

2. The Idaho Admission Bill declared that Idaho was "admitted into the Union on an equal footing with the original States in all respects whatever." 26 Stat.L. 215 ch. 656 § 1. The United States Supreme Court in *Shively v. Bowlby,* 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894), ruled that one aspect of the admission of a new state to the union on "equal footing" with the original states was that title to the

beds of navigable waters below the natural high water mark was transferred from the United States to the state. Ever since the case of *Callahan v. Price,* 26 Idaho 745, 146 P. 732 (1915), it has been settled law in Idaho that the state holds the title to the beds of navigable waters below the high water mark "for the use and benefit of the whole people." *Id.* at 754, 146 P. at 735.

therein, for which purpose the state may grant parcels of the submerged lands; and, so long as their disposition is made for such purpose, no valid objections can be made to the grants. It is grants of parcels of lands under navigable waters that may afford foundation for wharves, piers, docks, and other structures in aid of commerce, and grants of parcels which, being occupied, *do not substantially impair the public interest in the lands and waters remaining,* that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held by the state." (Emphasis supplied.)

And, the court in discussing the legislative power, went on to state:

"A grant of all the lands under the navigable waters of a state has never been adjudged to be within the legislative power; and any attempted grant of the kind would be held, if not absolutely void on its face, as subject to revocation. The state can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, *except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains,* than it can abdicate its police powers in the administration of government and the preservation of the peace. In the administration of government the use of such powers may for a limited period be delegated to a municipality or other body, but there always remains with the state the right to revoke those powers and exercise them in a more direct manner, and one more conformable to its wishes. *So with trusts connected with public property, or property of a special character, like lands under navigable waters; they cannot be placed entirely beyond the direction and control of the state.*" (Emphasis supplied.)

Therefore, a two part test emerges to determine the validity of the grant of public trust property. One, is the grant in aid of navigation, commerce, or other trust purposes, and two, does it substantially impair the public interest in the lands and waters remaining? The specific holding of *Illinois Central* is contained at 146 U.S. at 460, 13 S.Ct. at 121, 36 L.Ed. at 1045:

"The legislature could not give away nor sell the discretion of its successors in respect to matters, the government of which, from the very nature of things, must vary with varying circumstances. The legislation which may be needed one day for the harbor may be different from the legislation that may be required at another day. Every legislature must, at the time of its existence, exercise the power of the state in the execution of the trust devolved upon it. We hold, therefore, that any attempted cession of the ownership and control of the state in and over the submerged lands in Lake Michigan, by the act of April 16, 1869, was inoperative to affect, modify, or in any respect to control the sovereignty and dominion of the state over the lands, or its ownership thereof, and that any such attempted operation of the act was annulled by the repealing act of April 15, 1873, which to that extent was valid and effective. *There can be no irrepealable contract in a conveyance of property by a grantor in disregard of a public trust, under which he was bound to hold and manage it.*" (Emphasis supplied.)

Before we apply the rule in Illinois Central to the facts of this case we will review the evolution of the public trust doctrine in other jurisdictions. Massachusetts, Wisconsin and California are the three states with the wealth of authority on the subject.

### The Massachusetts Approach

In *Gould v. Greylock Reservation Commission,* 350 Mass. 410, 215 N.E.2d 114 (1966), the Supreme Judicial Court of Massachusetts concerned itself with the lease of 4,000 acres in Greylock Reservation to Mount Greylock Tramway Authority and an agreement between the tramway authority

and a management corporation. The legislature created the Greylock Reservation Commission. The commission was authorized to acquire 10,000 acres to be known as the Greylock State Reservation and it was given certain powers of a park commission. In 1953 the legislature created the Mount Greylock Tramway Authority, and the Authority was empowered to construct and operate an aerial toll tramway and all appurtenances thereto, and to issue revenue bonds to pay the costs. The Commission was authorized to lease to the Authority any portion of Mount Greylock Reservation for a period of time not to exceed forty years. The Commission then leased to the Authority 4,000 acres, representing almost half the total reservation. From 1953 to 1964 the Authority was unable to borrow the necessary money to build the tramway. A joint venture was formed, American Resort Services, Inc., between an investment firm which was willing to underwrite the bonds and a construction firm. The Authority then entered into a management agreement with Resort employing Resort as its agent to manage the tramway and related facilities under the general supervision and at the expense of the Authority. Resort was to receive 40% of the net operating revenues. Private citizens brought suit under the public trust doctrine to declare the lease and the agreement invalid. The court began its opinion by stating that "[t]he Greylock reservation, as rural park land, is not to 'be diverted to another inconsistent public use without plain and explicit legislation to that end. The policy of the commonwealth has been to add to the common-law inviolability of parks express prohibition against encroachment.' " 215 N.E.2d at 121 (citations omitted.) The court then concluded that the legislative authorization permitted the commission to lease only those portions of the reservation which might prove to be reasonably necessary to a project of permitted scope. In addressing the validity of the management agreement the court concluded that the broad delegation of power to Resort was in excess of the statutory grant, stating:

"This recreational scheme, in the profits of which Resort is to share, is to compete . . . with private recreational ventures of similar character. The profit sharing feature and some aspects of the project itself strongly suggest a commercial enterprise. In addition to the absence of any clear or express statutory authorization of as broad a delegation of responsibility by the Authority as is given by the management agreement, we find no express grant to the Authority of power to permit use of public lands and of the Authority's borrowed funds for what seems, in part at least, a commercial venture for private profit." *Id.* at 126.

In reaching this conclusion the court took into account that the act authorized a tramway, that this was to be a large ski development of a type usually undertaken by private developers, and most of the power of the Authority had been delegated to Resort. It was therefore very similar to a grant of public property to private developers for private profit.

In the cases subsequent to *Gould,* the Massachusetts court again required a strong showing of direct legislative intent to alienate public trust resources before it would uphold such alienation. In *Sacco v. Department of Public Works,* 352 Mass. 670, 227 N.E.2d 478 (1967), and *Robbins v. Department of Public Works,* 355 Mass. 328, 244 N.E.2d 577 (1969), the court set out the standard to be met to show adequate legislative intent, holding the legislature must identify the land and there must appear in the legislation not only a statement of the new use but a statement or recital demonstrating legislative awareness of the existing public use.

The Massachusetts approach has been explained by one noted author:

"[P]ublic officials are frequently subjected to intensive representations on behalf of interests seeking official concessions to support proposed enterprises. The concessions desired by those interests are often of limited visibility to the general public so that public sentiment is not aroused; but the importance of the

grants to those who seek them may lead to extraordinarily vigorous and persistent efforts. It is in these situations that public trust lands are likely to be put in jeopardy and that legislative watchfulness is likely to be at the lowest levels. To send such a case back for express legislative authority is to create through the courts an openness and visibility which is the public's principal protection against overreaching, but which is often absent in the routine political process." Sax, The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention, 68 Mich.L.Rev. 471, 495–96 (1970) (footnote omitted).

We do not agree that public trust resources may only be alienated by *express legislative* mandates. Such a requirement would impose an undue burden on a legislature which at the present time meets only a few months each year. However, we do follow the substance of the Massachusetts approach—that public trust resources may only be alienated or impaired through open and visible actions, where the public is *in fact* informed of the proposed action and has substantial opportunity to respond to the proposed action before a final decision is made thereon. Moreover, decisions made by non-elected agencies rather than by the legislature itself will be subjected to closer scrutiny than will legislative decisionmaking. In the present case, this standard has been complied with. Notice of the proposed permit was published in the Coeur d'Alene press, and public hearings were held before the State Department of Lands. The hearings involved oral as well as written testimony. Not only was testimony received but documentary evidence such as maps and photographs were introduced. KEA also submitted a petition against the permit to the hearing examiner. In addition, this controversy did not remain confined to examination by the Department of Lands. Concerned citizens brought the permit application and their opposition to it to the attention of the Board of Land Directors which convened specifically to address the question of the Panhandle Yacht Club application. The Board, at the emergency meeting convened for this purpose, imposed a moratorium on the issuance of future permits until a local comprehensive plan with implementing ordinances was enacted or until a year had passed, whichever came first. The Board, however, specifically made the moratorium inapplicable to present applications, one of which was the Yacht Club's.

### The Wisconsin Approach

The first case in Wisconsin to deal with the public trust doctrine was *Priewe v. Wisconsin State Land and Improvement Co.,* 93 Wis. 534, 67 N.W. 918 (1896). A promoter claimed title to land under Muskego Lake and obtained passage of a law which permitted him to drain it. The asserted justification for the law was that drainage was required for the preservation of public health. The defense claimed that a legislative determination of public purpose is conclusive on the judiciary. The Wisconsin court held that the final determination must be made by the judiciary. The court then struck down the statute as made for private purposes and for the sole benefit of private parties. *Priewe* involved a finding of fraudulent legislative purposes. The next two Wisconsin cases also involved proposals to drain wetlands for agricultural reclamation. An inquiry as to the proposals was made by a state commission and the report of the commission was before the court. In the first case, *In re Trempealeau Drainage Dist. Merwin v. Houghton,* 146 Wis. 398, 131 N.W. 838 (1911), the court held that the drainage scheme was within the appropriate bounds of legislative authority and therefore, valid. The court did concern itself with the effect on fishing and hunting and then concluded that although they would be somewhat impaired it did not amount to substantial infringement.

The second case, *In re Crawford County Levee & Drainage Dist. No. 1,* 182 Wis. 404, 196 N.W. 874 (1924), involved a project to reclaim wetland that had been used for hunting and fishing. The state commission which authorized the drainage had made a finding that hunting, fishing and naviga-

tion would not be wholly destroyed. The court relied on the finding of "not wholly destroyed" and said that the report thus implied that there would be substantial destruction of those rights. The drainage was not allowed. The court held that navigable waters available to the whole public could never be converted to private farmland. In later cases this approach was held to be far too inflexible and the court thereafter sought to refine its approach.

In *City of Milwaukee v. State,* 193 Wis. 423, 214 N.W. 820 (1927), the city made an exchange of land with a steel company in order to obtain shoreland for the development of the city's harbor. The court examined the broad impact of the transaction upon public uses in general and eschewed such narrow considerations as whether any particular acre would be lost to public recreation. The court addressed *Crawford County* and *Priewe* and distinguished them on the basis that in those cases consummation of the scheme would have materially affected the rights of the public to the navigable waters of the lakes, considering their size, depth, and the purposes for which they were primarily adapted. The court did not indicate that it would substitute its judgment for that of the legislature, but did imply that it would not approve any transaction in which broad public rights are set aside in favor of more limited or private rights, especially in the absence of persuasive justification for the transaction.

In *State v. Public Service Commission,* 275 Wis. 112, 81 N.W.2d 71 (1957), the court was faced with the situation in which the city of Madison, which owned a park fronting a recreational lake wanted to fill part of a lagoon, fill a portion of the lake bed, use the field area for a parking lot, and enlarge a beach area. Suit was brought by the Attorney General who claimed that because navigation would be destroyed the fill violated the public trust doctrine. The court rejected this claim and adopted five criteria to aid in the determination of whether the public trust doctrine would be violated in a specific case. These criteria are:

"1. Public bodies will control the use of the area.

2. The area will be devoted to public purposes and open to the public.

3. The diminution of lake area will be very small when compared with the whole of Lake Wingra.

4. No one of the public uses of the lake as a lake will be destroyed or greatly impaired.

5. The disappointment of those members of the public who may desire to boat, fish, or swim in the area to be filled is negligible when compared with the greater convenience to be afforded those members of the public who use the city park." 81 N.W.2d at 73.

*City of Madison v. State,* 1 Wis.2d 252, 83 N.W.2d 674 (1957), concerned the filling of land to build an auditorium. The court expanded its doctrine and held that such use would enhance the other uses of the property. The court looked to conflict and compatibility between various uses rather than restricting its view to allow only water-related uses.

We take the following guidance from the approach adopted by the Wisconsin court. Final determination whether the alienation or impairment of a public trust resource violates the public trust doctrine will be made by the judiciary. This is not to say that this court will supplant its judgment for that of the legislature or agency. However, it does mean that this court will take a "close look" at the action to determine if it complies with the public trust doctrine and it will not act merely as a rubber stamp for agency or legislative action. In making such a determination the court will examine, among other things, such factors as the degree of effect of the project on public trust uses, navigation, fishing, recreation and commerce; the impact of the individual project on the public trust resource; the impact of the individual project when examined cumulatively with existing impediments to full use of the public trust resource, *i.e.* in this instance the proportion of the lake taken up by docks, moorings or other impediments; the impact

of the project on the public trust resource when that resource is examined in light of the primary purpose for which the resource is suited, *i.e.* commerce, navigation, fishing or recreation; and the degree to which broad public uses are set aside in favor of more limited or private ones.

### The California Approach

*People v. California Fish Co.,* 166 Cal. 576, 138 P. 79 (1913), contains a comprehensive analysis of the public trust doctrine. That case involved a sale of swamp and tidelands by the California legislature without any consideration of the public trust pursuant to which the state holds the tidelands. The court held that the grant was subject to the public trust:

> "statutes purporting to authorize an abandonment of ... public use will be carefully scanned to ascertain whether or not such was the legislative intention, and that intent must be clearly expressed or necessarily implied. It will not be implied if any other inference is reasonably possible. And if any interpretation of the statute is reasonably possible which would not involve a destruction of the public use or an intention to terminate it in violation of the trust, the courts will give the statute such interpretation." 138 P. at 88.

In order to uphold the tidelands grant, the court construed the statute in light of public trust requirements:

> "[The statutes] can be given some effect if construed to authorize the sale of such land subject to the public easements, the purchaser to be without authority to interfere with such use, or with the further administration thereof by or on behalf of the state. They are reasonably susceptible of that interpretation; hence they will be so construed. The holder of a patent from the state under these laws will have the naked title to the soil." *Id.*

The development of the public trust doctrine in California is discussed at length in *City of Berkeley v. Superior Court of Alameda,* 26 Cal.3d 515, 162 Cal.Rptr. 327, 606 P.2d 362 (1980). Basically, two rules developed in California: (1) The state may make an absolute grant of tidelands to private parties when to do so is to promote navigation and commerce; and (2) Grants to private persons not for this purpose do not pass title free of the trust, but rather title is taken subject to the trust. *City of Berkeley* followed the *California Fish Co.* rule. The property in *City of Berkeley* was granted pursuant to an 1870 statute which authorized the sale of tidelands to private parties. The court overruled two earlier cases which had held that these grants were in fee simple and not subject to the rights of the public. The court held that since the grants were not made in aid of navigation, the grantees took title subject to the public trust.

In *National Audubon Society v. Superior Court of Alpine County,* 33 Cal.3d 419, 189 Cal.Rptr. 346, 658 P.2d 709 (1983), the California court has provided a comprehensive statement of the current status of the public trust doctrine. That case, commonly referred to as the "Mono Lake case," involved an interplay between the public trust doctrine and the scope of the public trust vis a vis established appropriated water rights.

Mono Lake, the second largest lake in California sits at the base of the Sierra Nevada escarpment near the eastern entrance to Yosemite National Park and is fed by five freshwater streams. Los Angeles had obtained a permit to divert virtually the entire flow of four of the five streams and construct facilities to divert the water to the city. It diverted approximately one-half of the flow in the 1940's and in 1970 completed further diversion works taking virtually the entire flow of the four streams. As a consequence, by October 1979, the lake level had shrunk from a prediversion area of 85 square miles to an area of 60.3 square miles and its surface level had dropped 43 feet with the expectation that future diversions would lower the level another 43 feet and reduce its surface area by about 22 square miles over the next 80 to 100 years.

The California court, in ruling that the public trust doctrine takes precedent even over vested water rights, enunciated the following principles:

"[T]he continuing power of the state as administrator of the public trust ... extends to the revocation of previously granted rights or to the enforcement of the trust against lands long thought free of the trust." 189 Cal.Rptr. at 360, 658 P.2d at 723.

"Any licenses granted by the statute, moreover, [remain] subject to the trust: 'The state may at any time remove [the] structures ..., even though they have been erected with its license or consent, if it subsequently determines them to be purprestures or finds that they substantially interfere with navigation or commerce.'" 189 Cal.Rptr. at 359, 658 P.2d at 722.

"Except for ... rare instances ... the grantee holds subject to the trust, and while he may assert a vested right to the servient estate (the right of use subject to the trust) and to any improvements he erects, he can claim no vested right to bar recognition of the trust or state action to carry out its purposes." 189 Cal.Rptr. at 360, 658 P.2d at 723.

"[T]he public trust is more than an affirmation of state power to use public property for public purposes. It is an affirmation of the duty of the state to protect the people's common heritage of streams, lakes, marshlands and tidelands, surrendering that right of protection only in rare cases when the abandonment of that right is consistent with the purposes of the trust." 189 Cal.Rptr. at 360–361, 658 P.2d at 723–724.

Under the California rule statutes alienating public trust resources will be construed in light of the public trust doctrine requirements. The public trust doctrine takes precedent even over vested water rights. Grants, even if purporting to be in fee simple, are given subject to the trust and to action by the state necessary to fulfill its trust responsibilities. Grants to individuals of public trust resources will be construed

as given subject to the public trust doctrine unless the legislature explicitly provides otherwise.

This case involves the granting of a permit for an encroachment, and not the grant of property in fee simple, to private parties. The property has not been placed entirely beyond the control of the state and the legislature has not given away or sold the discretion of its successors. The Department of Lands has determined that the use of the public trust property by the yacht club for the purpose of constructing sailboat slips does not violate the public trust in the resource at this time. After a thorough examination of the record in this case and a review of the evidence before the Department, we agree. However, the grant remains subject to the public trust. Under the California rule herein adopted, the state is not precluded from determining in the future that this conveyance is no longer compatible with the public trust imposed on this conveyance.

## II

KEA contends that the State Land Board has unlawfully delegated its authority to pass on applications of such magnitude to the Department of Lands. We disagree.

The State Land Board is a constitutionally created body, (Idaho Const. art. 9, § 7), with its functions to be exercised by the Department of Lands as its "instrumentality," (I.C. § 58–101 et seq.) The State Land Board has the direction, control and disposition of the public lands of the state. I.C. § 58–104 sets forth the powers and duties of the state land board. In particular, subsection (9) is applicable here and reads,

"To regulate and control the use or disposition of lands in the beds of navigable lakes, rivers and streams, to the natural or ordinary high water mark thereof, so as to provide for their commercial, navigational, recreational or other public use; provided, that the board shall take no action in derogation of or seeking to interfere with the riparian or littoral rights of the owners of upland property abutting or adjoining such lands...."

I.C. § 58–119 sets forth the powers of the department of lands reading in pertinent part as follows: "To exercise, under the general control and supervision of the state board of land commissioners all the rights, powers and duties vested by law in the state board of land commissioners .... "

■ It is clear, therefore, that the Department of Lands acting as the representative of the State Land Board has the power to dispose of public lands. This power is not absolute, however, and is subject to the limitations imposed by the public trust doctrine. As before stated, we do not construe the public trust doctrine in this state to allow public trust resources to be alienated only legislatively. Nor do we construe it to prohibit the State Land Board from delegating its authority to make such decisions to the State Department of Lands. However, it must again be emphasized that mere compliance by these bodies with their legislative authority is not sufficient to determine if their actions comport with the requirements of the public trust doctrine. The public trust doctrine at all times forms the outer boundaries of permissible government action with respect to public trust resources.

We next must determine whether the Department of Lands has acted within the applicable statutory framework. I.C. § 58–144 provides: "The board of land commissioners shall regulate, control and may permit encroachments in aid of navigation or not in aid of navigation on, in or above the beds or waters of navigable lakes as provided herein." I.C. § 58–145 states that the board may adopt, revise, and rescind such rules and regulations and issue such general orders as may be necessary to effectuate the purposes and policy of this chapter.

Because the state land board found that the application here was for a quasi-commercial encroachment, we will analyze the facts in accordance with I.C. § 58–147 for commercial navigational encroachments. The procedures in that section provide for the publishing of the application in a newspaper having general circulation in the county in which the encroachment is proposed and describing the encroachment and the general location thereof. The state land board may also furnish copies of the application to other state agencies which may have an interest in the lake to determine their opinion as to the likely effect of the proposed encroachment upon adjacent property and lake value factors of navigation, fish and wildlife habitat, aquatic life, recreation, aesthetic beauty and water quality. The section also provides for the filing of an objection with the state land board by private citizens and a hearing within ninety days. After the board issues findings, the applicant or other aggrieved party may have the decision of the land board reviewed by the district court.

■ After the application was filed, K.E.A. requested a hearing. Approximately twenty-six people testified, including a deputy with the marine division of the Kootenai County sheriff's office, a representative of the Idaho Fish and Game Department, and local residents. The hearing officer, William A. Scribner, entered findings of fact and conclusions of law, which were adopted by Gordon C. Trombley, director of the Department of Lands. The hearing officer found that an economic need existed for sailboat moorage; the facility would not impair the aesthetics of the view from Sanders Beach and Tubbs Hill; that the area proposed for the facility has been used for fishing and that construction would impair fishing access for a small number of users, as compared to the recreation opportunity afforded the owners of 112 sailboats; that placement of dockage would not impair fish or aquatic habitat and in fact may improve habitat by providing overhead cover; that the structure would not impair water quality; and that the proposed installation would not interfere with or be a hazard to navigation if properly lighted and marked. He concluded, pursuant to I.C. § 58–142, that a navigational or economic necessity or justification has been established and that little or no adverse effect will be registered against property, navigation, fish and wildlife habitat, aquatic life,

recreation, aesthetic beauty or water quality.

In light of the Director's findings and conclusions, coupled with the fact of the notice and public hearing, and the fact of compliance by the State Land Board with its statutory authority, and our above articulation of the public trust doctrine, we hold that the issuance of this encroachment permit and license to the Panhandle Yacht Club does not violate the public trust doctrine. Therefore, the decision of the trial court is affirmed. We note, however, the grant remains subject to the "public trust."

We have considered appellant's additional assignments of error and find them to be without merit. The judgment of the district court is affirmed. Costs to respondents. No attorney fees on appeal.

BAKES, J., concurs.

DONALDSON, C.J., and SHEPARD, J., concur in the result.

BISTLINE, Justice, concurring in the Court's judgment.

I agree with the majority that the public trust doctrine applies to state-owned submerged lands within the state. I also agree with the majority's general discussion of the doctrine. On rehearing I now agree with the majority's application of that doctrine to the facts of this case.

I.

I agree with the majority's conclusion that case law in other states has uniformly required that state-owned submerged lands be alienated or encumbered only for public purposes. *See Morse v. Oregon Division of State Lands,* 285 Or. 197, 590 P.2d 709 (1979) (fill may be for non-water related purposes so long as public need for project outweighs interference with traditional trust purposes); *State v. Public Service Commission,* 275 Wis. 112, 81 N.W.2d 71, 73–74 (1957) ("In [upholding a grant of an interest in submerged lands], we attach importance to these facts: (1) Public bodies will control the use of the area. (2) The area will be devoted to public purposes and

open to the public. . . . (4) No one of the public uses of the lake . . . will be destroyed or greatly impaired. (5) The disappointment of those members of the public who may desire to boat, fish or swim in the area to be filled is negligible when compared with the greater convenience to be afforded those members of the public who use the city park."); *City of Berkeley v. Superior Court of Alameda County,* 26 Cal.3d 515, 162 Cal.Rptr. 327, 606 P.2d 362, 373 (1980) ("[T]he principle we apply is that the interests of the public are paramount in property that is still physically adaptable for trust uses . . . ."); *see generally The Public Trust Doctrine in Natural Resources Law . and Management: A Symposium,* 14 U.C.Davis L.Rev. 181 (1980). A true public purpose in this case is here very difficult to find. Unfortunately, although the majority adopts a public trust doctrine which apparently includes a public purpose requirement, the majority opinion does not provide a convincing analysis of the public purpose fulfilled by granting the encroachment permit to the private yacht club.

An intimation of KEA's brief, to some extent supported by the record, and a proposition which in turn seems to have escaped the attention of the hearing officer, the Director, the district court, and now this Court, is that the real public purpose here being served, if such it be, is that there will be a substantial number of sailboats henceforth missing from their "moorages" on trailers parked on driveways in the City of Spokane and throughout Spokane County, while a commensurate number of Idaho sailboat owners, less affluent perhaps, or not one of the 112 yacht club members, will continue trailering their boats back and forth from home to public launching pads. Perhaps the neighorboring state of Washington, if asked to give moorage on the Hood Canal, would be as kind to Idaho people. Perhaps the commands of the Interstate Commerce Clause of the federal constitution precludes such concerns.

The hearing officer and the director of the Department of Lands found that the encroachment would not interfere with nav-

igation or impair visual aesthetics on the lake, although it would interfere with fishing in the area. Under the public trust doctrine, however, the state must demonstrate *not only* that certain public uses will not be interfered with or only minimally interfered with; it must demonstrate that the purpose for the encumbrance of the state-owned lands is in fact a public one. In this regard the only findings by the hearing officer and director relevant to public purpose were: (1) "an economic need exists as evidenced by unrefuted testimony because sailboat moorage is not available on Lake Coeur d'Alene except after a long wait, seasonal rentals for 1978 was [sic] $450 to $500, and because demand for rental moorage exceeds the supply," and (2) "the use is an alternative to rental at established commercial marinas, and each slip will be individually owned and ... the operation is quasi-commercial albeit proposed by a non-profit organization."

If in fact the moorage at the yacht club would be open to the public, or if the moorage were available for term rentals on a lottery, or on a first-come, first-serve basis, I would outright agree that the club serves a public purpose. I am not this day brought to say that this exclusive private yacht club will serve a public purpose. Where there is no evidence that a like facility will later be allowed, it would be extremely difficult to join the majority view. Following the granting of a rehearing, and further briefing and argument, I see considerable merit in the more relaxed view expressed by Justice Shepard in his opinion of July 8, 1982, which today brings me to concur in the Court's judgment although I decline to join the majority opinion. Justice Shepard earlier wrote the following, which was earlier concurred in by Chief Justice Donaldson, and which I now deferentially adopt as my view—that we do review a very de minimus situation.

"Further I note that the lower court in essence found that the proposal of Panhandle Yacht Club would be a 'public purpose.' I do not disagree, although in my opinion it is of an extremely limited sort. That court found that the facility was to. be used by 'large numbers of people' and that there was a 'reasonable expectation of frequent changes in membership.' Of perhaps more significance are the findings indicating the limited numbers of, and pressures for, dockage and moorage facilities for recreational boats on Lake Coeur d'Alene. It was indicated that the facilities of Panhandle would, to some extent, relieve the pressure on other commercial and totally public facilities, thereby giving the public more access to dockage and mooring facilities.

"Hence, I believe that when such a limited 'public' use is measured against the limited infringement upon the remaining public uses, there is no violation of the trust doctrine. It is probable, in my mind at least, that if Panhandle's use were less 'public' then the same infringement would not be permitted. It would appear to me that the greater the benefits received by the public, the more encroachment and the more leeway the courts should allow inhibiting the public trust. Conversely, a greater encroachment with less benefit to the public, the more loath the courts should be to permit such intrusion onto the public trust."

## II.

I recognize, of course, that docks and moorages are aids to navigation. In the seminal public trust case, *Illinois Central R.R. Co. v. Illinois,* 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892), the Supreme Court stated:

"It [title to submerged lands] is a title held in trust for the people of the State, that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein, freed from the obstruction or interference of private parties. The *interest of the people* in the navigation of the waters and in commerce over them may be improved in many instances by the erection of wharves, docks, and piers therein, *for which purpose the State may grant parcels of the submerged* lands; and, *so long*

as their disposition is made *for such purpose,* no valid objections can be made to the grants. It is grants of parcels of lands under navigable waters, that may afford foundation for wharves, piers, docks, and other structures in aid of commerce, and grants of parcels which, being occupied, *do not substantially impair the public interest in the lands and waters remaining,* that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power *consistently with the trust to the public* upon which such lands are held by the state." 146 U.S. at 452, 13 S.Ct. at 118 (emphasis added).

It is clear from the quoted language that grants in aid of navigation are permissible so long as they are in aid of *public* navigation; grants in aid of the navigation of a small, exclusive class of yacht owners do not satisfy the public purpose requirement. The legislature has recognized this distinction in I.C. § 67–4304, which provides:

"Priest, Pend d'Oreille, and Coeur d'Alene Lakes—Appropriation of waters in trust for people.—The governor is hereby authorized and directed to appropriate in trust for the people of the state of Idaho all the unappropriated water of Priest, Pend d'Oreille and Coeur d'Alene Lakes or so much thereof as may be necessary to preserve said lakes in their present condition. The preservation of said water in said lakes *for* scenic beauty, health, recreation, transportation and *commercial purposes necessary and desirable for all the inhabitants of the state* is hereby declared to be a beneficial use of such water.

"No fee shall be required in connection with said appropriation by the governor or the permit issued in connection therewith, and no proof of completion of any works of diversion shall be required, but license shall issue at any time upon proof of beneficial use to which said waters are now devoted.

"Each succeeding governor in office shall be deemed to be a holder of such permit, in trust for the people of the state." (Emphasis added.)

Yacht club membership is limited; members of the public are not allowed to use the yacht club facilities. Memberships become available to the public only upon the whim of existing members who wish to sell their membership; the fee is not inexpensive. I cannot see how this can be a beneficial use, as defined in I.C. § 67–4304, that the waters of the lake be preserved for "commercial purposes necessary and desirable for *all* the inhabitants of the state . . . ." At the best, the club moorage may produce some incidental benefits for the other boaters on the lake by reducing the number of boats riding at anchor in a widespread area, but this was not recognized as a purpose by the state in granting the lease. In short, a private yacht club is not a commercial purpose that is necessary and desirable for all the inhabitants of the state. Neither is it a public purpose which is within the power of the state to grant under its trust duties to the public which it serves.

### III.

Finally, I want to emphasize that small and reasonable private navigational encroachments of riparian owners necessary for their recreational enjoyment of their own property and the waters to which that property is appurtenant do not violate the public trust doctrine. The degree of intrusion is minimal and the public's access to and use of the beds and waters is not improperly disturbed.

I.C. § 58–142 establishes a state system for regulating all encroachments upon navigable lakes. It provides:

"Encroachment on navigable lakes—Legislative intent.—The legislature of the state of Idaho hereby declares that the public health, interest, safety and welfare requires that all encroachments upon, in or above the beds or waters of navigable lakes of the state be regulated in order that the protection of property, navigation, fish and wildlife habitat, aquatic life, recreation, aesthetic beauty and water quality be given due consideration and weighed against the navigational or

economic necessity or justification for, or benefit to be derived from the proposed encroachment. No encroachment on, in or above the beds or waters of any navigable lake in the state shall hereafter be made unless approval therefor has been given as provided in this act."

The regulatory scheme, however, distinguishes between encroachments for private (noncommercial) purposes and encroachment for commercial purposes. I.C. § 58–146 provides in part:

"Noncommercial navigational encroachments—Procedures—Repairs—Forms.—
(a) Applications for construction, enlargement or replacement of navigational encroachments not extending beyond the line of navigability nor intended primarily for commercial use shall be processed by the board with a minimum of procedural requirements and shall not be denied nor appearance required except in the most unusual of circumstances or if the proposed encroachment infringes upon or it appears it may infringe upon the riparian or littoral rights of an adjacent property owner."

This provision, the constitutionality of which may some day be before the Court, seemingly in a negative manner simply restates the pre-existing case law recognizing the right of riparian owners to wharf out, but not to the point where infringement is made upon other rights. The prerequisites to obtaining a permit for a commercial encroachment, however, are extensive. *See* I.C. § 58–147. Implicit in this regulatory scheme is the legislative recognition of the fact that private, noncommercial encroachments, if such they are, as a general matter involve very little intrusion upon the public's interest, and allow aesthetic and recreational use of the lake by the riparian owner, who apparently is by the legislature left unfettered by the stringent requirements of would-be commercial enterprises. Commercial developments such as the yacht club, however, receive an economic benefit at the expense of the general public which uses the waters encroached upon. The distinction made by the legislature in this regard is consistent with the traditional public trust doctrine.